**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JOHANN YARBOROUGH                    *

Petitioner                          *

v                                   *        Civil Action No.  JKB-15-1337

FRANK B. BISHOP and                  *
THE ATTORNEY GENERAL OF THE
STATE OF MARYLAND                    *

Respondents                          *
                                    ***

## MEMORANDUM

Respondents seek dismissal of the above-entitled petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  ECF 11.  Petitioner has responded (ECF 12) and the court finds the record is sufficient to determine the issues raised.  No hearing is deemed necessary.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2016);  *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)).  For the reasons set forth below, the petition shall be dismissed and a certificate of appealability shall not issue.

### State Court Proceedings

#### Pre-trial Motion to Suppress

Prior to trial, defense counsel filed a motion to suppress a photo-array identification made by Trevor Anglin and statements made by Yarborough to police in an initial interview prior to arrest as well as statements made after he was arrested.  ECF 11 at Ex. 2.  Testimony regarding the photo-array identification was provided by Detective Cynthia Conrad of the Takoma Park Police Department.  *Id*. at pp. 5 – 22.  She explained that eight color photographs of males with similar traits of the same race were shown to Anglin after he was located on the street he usually

frequents.[1]  *Id.* at pp. 6 and 12.   Conrad stated that Anglin had no fixed address and the identification process took place in her unmarked police car.  *Id.* at p. 12.   When looking at the array, Anglin said the man he saw on the night of the murder looked like the men depicted in two different photographs, one of whom was Yarborough.  *Id.* at pp. 10 - 11.   The trial court denied the defense motion to suppress the identification because there was no evidence that the process was suggestive and, also, Yarborough's picture had not been broadcast on the news at the time of the identification.  *Id.* at p. 22.

Yarborough spoke to police on November 30, 2006, the day after Tarais Araia was murdered.  Detective Richard Poole testified that at that time Yarborough was a suspect and that he and Lt. Tyron Collington went to the Ritz Cab Company in Washington D.C., where Yarborough worked, to talk to him.  ECF 11 at Ex. 2, pp. 23 – 25.   Prior to arriving, Poole explained he had spoken with Yarborough's boss to get permission to use his office to interview Yarborough.  *Id.* at p. 26.   Poole testified that he made this arrangement for purposes of maintaining Yarborough's privacy and stated, "I didn't think it was fair to have everyone know what we were talking about."  *Id.* at p. 28.   Poole further testified that he told Yarborough at the beginning of the interview that he was not under arrest, that he did not have to answer their questions, and that he was free to leave at any time.  *Id.* at p. 27.   Poole described the office as slightly cramped but stated that the door was unlocked and that he and Collington were wearing business suits and their service weapons were not visible.  *Id.* at p. 28.   Yarborough agreed to talk to Poole and Collington and the tone of the interview was conversational and friendly.  *Id.* at p. 31.   Poole stated that Yarborough appeared sober and did not appear to be ill or confused during the interview, which lasted two hours and forty minutes.  *Id.* at pp. 30 – 31.   The interview terminated when Yarborough stated "if she is dead then I want a lawyer."  *Id.* at p. 32.

---

[1]  At trial, Anglin admitted he was homeless.  ECF 11 at Ex. 4, pp. 94 – 95.

Yarborough then asked Poole if he knew of any lawyers he could call and when Poole said he did not, Yarborough said he would take a polygraph without an attorney present. *Id*. at pp. 33 and 65.

A warrant for Yarborough's arrest was issued on December 1, 2006, and executed the following day. ECF 11 at Ex. 2, pp. 33 – 34. Yarborough was arrested in the District of Columbia and waived extradition to Maryland; Poole and Collington traveled from Takoma Park to bring Yarborough back to Maryland on December 6, 2006. *Id*. at p. 34. Yarborough was brought to the Takoma Park police station where he was processed and then brought into an interview room where Poole and Collington met with him. *Id*. Poole testified that he used a "rights form" that listed Yarborough's rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and that each right was read aloud to Yarborough. *Id*. at pp. 36 – 38. On that form, Yarborough indicated by initialing each item that he understood his rights; that he was sober; and that his education level was ninth grade with a GED. *Id*. at p. 36. Yarborough indicated on the form and verbally that he wanted to talk to the police. *Id*. at p. 43.

Defense counsel argued that once Yarborough invoked his right to an attorney during the November 30th interview, police were obligated to cease all questioning under *Miranda* and its progeny. ECF 11 at Ex. 2, pp. 55 – 59. He further argued that the invocation of his right to an attorney extended to the date of the interrogation that occurred after he was arrested and brought to Maryland. *Id*. In defense counsel's view, Yarborough, or a reasonable person in his position, would not have felt free to leave the November 30th interview, making the interview custodial under *Miranda* and *Edwards*.[2] *Id*. Counsel stated, "On December 6 they know he's asked for a

---

[2] *Edwards v. Arizona*, 451 U.S. 477 (1981) (holding police may not initiate questioning after a suspect invokes his right to counsel).

lawyer," but initiated conversation with Yarborough in violation of *Edwards*. *Id*. at pp. 59 and

61.

The trial court denied the motion to suppress Yarborough's statements made during both

interviews.  ECF 11 at Ex. 2, pp. 66 – 68.  The court stated:

> Most of the cases that involve the issue of statements taken after an initial
> invocation of the fifth amendment right, involve a contiguous set of events
> where the police have spoken with someone and do one of two things.  Either,
> one, continue to engage in discussion or conduct that is designed to wear the
> defendant down to perhaps get the defendant to change his or her mind about
> giving the statement.  That didn't happen in this case.  There are also those
> cases where the proverbial good cop/bad cop scenario occurs and that is where
> one police officer talks to an individual. He or she invokes the fifth amendment
> right to counsel and decides that they don't want to speak and another officer,
> either the good one or the bad one depending upon what the order is, goes in
> and attempts to get a statement from the individual after their rights have been
> invoked.  That didn't happen in this case.  There were several days after the
> initial police contact.
>
> The Court discounts the initial contact for the following reasons. One, the
> defendant was not in custody. The officer expressly stated you are not under
> arrest. You can get up and leave at any time.  We'd like to talk to you.  The
> reason that we're going to go into a room, the officer testified today was to
> quite frankly out of respect for the defendant's privacy.  It was his workplace.
> This was a serious investigation.  And they didn't want to do the interview out
> in the open where other employees or even his boss could potentially hear what
> the conversation was about.  The conversation ended by the defendant saying
> that he wished to talk to a lawyer after he made the comment to the officers,
> you know, are you telling me she's dead and then he said he wanted a lawyer.
> And all questioning with respect to the incident that was the subject of this
> investigation stopped.
>
> Several days later the defendant was arrested.  The officers were now going to
> charge him with the crime of murder. And the TP-50 -- I think it's a reasonable
> inference is Takoma Park Form 50 was executed. And all it is, is a Miranda
> rights form where each question was asked that's required under Miranda. And
> each answer was checked off. The defendant appeared to be alert.
>
> Let me note, parenthetically, that throughout all of these encounters with the
> police, the defendant appeared to be congenial. The parties were polite to each
> other. He was polite and courteous. And on the first encounter even shook
> hands with the detectives when the interview ended. There is not the slightest
> scintilla -- I suppose that's redundant, but there is not (sic) evidence of any

coercion or improper conduct on behalf of the police in this case at this point and there is no basis upon which the Court can find any violation of the defendant's fifth or sixth amendment right to the constitution of the United States. And for those reasons, the motion to suppress is denied.

ECF 11 at Ex. 2, pp. 66 – 68.

<u>Jury Trial</u>

After empaneling a jury on February 4, 2008 (*see* ECF 11 at Ex. 3), trial began on the following day.  In her opening statement, the State's Attorney characterized the case as one involving domestic violence and mentioned that the victim, Terhas[3] ("Terry") Araia, was originally from Eritrea, Africa, and lived with her parents in Takoma Park.  ECF 11 at Ex. 4, p. 9.

The first witness to testify for the State was Michael Hodge, who described himself as a childhood friend of Yarborough.  ECF 11 at Ex. 4, pp. 23 – 41.  Hodge testified that he saw Yarborough on the evening of November 29, 2006, when he was walking through the neighborhood after getting high.  *Id*. at p. 26.  Hodge related that he agreed to go with Yarborough to Takoma Park to see a man who owed Yarborough money.  *Id*. at pp. 26 – 27.

Yarborough drove a maroon and gray taxi cab and Hodge rode in the passenger seat.  *Id*. Hodge described Yarborough moving the car several times when they reached Takoma Park and testified that Yarborough got out of the car more than once.  *Id*.  When a bus came down the street, Hodge stated that Yarborough got out of the car once again, crossed the street, and was walking toward a female.  *Id*. at p. 34.  Hodge related that Yarborough had taken something with him when he left the car.  *Id*.  Shortly thereafter, Hodge heard the woman screaming "no, no," and Hodge moved from the passenger seat to the driver's seat because he had plans to leave the area.  *Id*. at p. 35.  As Hodge moved the car, he saw Yarborough looking for the car and stopped

---

[3] The victim's name has various spellings in the record.

to let him in.  *Id*. at p. 36.   Hodge continued to drive and said that Yarborough gave him directions to get out of the area, but did not answer his questions about what he had just done. *Id.* Shortly after driving away, Yarborough asked Hodge to stop the car and Yarborough got out of the car and threw something towards a wooded area.  *Id*. at pp. 36 – 37.

When he was initially questioned by the police, Hodge denied any knowledge of the incident and denied being with Yarborough on the date of the murder.  ECF 11 at Ex. 4, pp. 41 – 61 (cross-examination).   Hodge explained that he was scared to admit what had happened because he did not want to be implicated as a get-away driver.  *Id*. at pp. 61 – 63 (redirect).

Travis Anglin, an eyewitness to the murder, testified for the State.  ECF 11 at Ex. 4, pp. 68 – 98.  Anglin testified that he was sitting on a wall on a street near the scene with two friends when he saw the taxi-cab drive up.  He said it caught his eye because the car was parked in an unusual spot and because it was moved several times.  He stated that after his two friends left, he kept an eye on the car and saw a man get out of the passenger side of the car after the bus arrived and people got off.  Anglin said the man was following a woman up to the apartment building with something behind his back.  *Id*. at p. 84.  At first Anglin said he thought the man was going to surprise her with flowers, but when the man reached the woman, Anglin saw him raise a hammer over his head and strike her in the head.  *Id*. at p. 85.  Anglin said when the assault began, the assailant was striking the victim with the claw side of the hammer, then spun the hammer around and used the other side.  *Id*. at p. 85.  Anglin testified he saw this man strike the victim five times and that the victim was screaming for help.  He described the assailant as short and stocky, African American, wearing a white shirt and blue jeans.  *Id*. at p. 90.  Anglin saw the assailant run from the scene and get back into the same taxi cab on the passenger side.  *Id*. at p. 105 – 06.

When asked if he saw the same man in the courtroom, Anglin was reluctant to identify Yarborough, insisting that he did not "point fingers."  ECF 11 at Ex. 4, pp. 88 – 90.  Anglin identified the color of the shirt and tie Yarborough was wearing in the courtroom, and the trial court permitted that testimony to be an in-court identification of Yarborough over objection by defense counsel.  *Id.*  Additionally, Anglin was asked about the photo-array he was shown by police and testified that he identified two pictures as resembling the man he had seen beating Araia with a hammer.

On cross-examination, Anglin insisted that the man he saw attacking Araia had exited from the passenger side of the cab prior to the attack.  ECF 11 at Ex. 4, pp. 105 – 06.  Anglin also testified that he had a better look at the passenger in the cab than he had at the driver.  *Id.* at p. 111.  During redirect, Anglin was asked if Yarborough was the man he saw that night and, over objection, was permitted to confirm that he was the same man. [4]  *Id.* at p. 107.

Bryan Hughes was at the Deauville Apartment building where the murder took place and where Araia lived, on the evening Araia was killed.  ECF 11 at Ex. 4, p. 114 – 23.  He testified that he was there to visit a friend, Linda Jones, who lived on the seventh floor of the building.  *Id.* at pp. 114 – 15.  Hughes stood outside the apartment building for approximately 15 minutes smoking a cigarette, waiting for Jones to finish getting dressed.  While waiting, Hughes observed a heavy-set black man walking up and down the street and described him as wearing a white shirt and blue jeans.  After arriving in Jones's apartment, Hughes said he and Jones heard a scream and a loud thud that he thought could have been a gunshot.  *Id.* at pp. 116 – 17.  Hughes looked out the window and then went outside to see if the woman he heard screaming was okay.

---

[4]   During his testimony, Anglin made several statements that were not responses to questions but were apparently directed at Yarborough. *See e.g.*, ECF 11 at Ex. 4, p. 107 ("You don't kill no broad, sir.  You killed a girl."); p. 108 ("I know what you did dog.").  Defense counsel asked the court to admonish the witness not to speak unless a question was asked of him and he was so admonished.  *Id.* at p. 109.

*Id.*  Hughes testified that when he arrived downstairs he saw a man running away and identified him as the same man he saw earlier walking on the street before he went to Jones's apartment. *Id.* at pp. 118 – 19.  Hughes described the man running away as a black male, heavy-set without much hair, wearing a white shirt and blue jeans.  *Id.* at p. 118.  Hughes stated that the man did not look like he knew where he was going because he was zig-zagging across the street.  *Id.* Hughes called the police and stayed with Araia, attempting to keep her conscious.  *Id.* at p. 119. Although Hughes went to grade school with Araia and described her as a friend, he testified that he did not recognize her due to the large amount of blood on her face.  *Id.* at p. 120.  When Hughes realized who she was, he went to her side, waited for the police, and flagged them down when he saw them arrive.  *Id.*

Linda Jones, a resident of the apartment building where Araia lived and where the murder occurred, testified for the State.  ECF 11 at Ex. 4, pp. 124 – 136.  Jones explained she lives on the top floor of the seven-story building and her windows wrap around the front corner of the building.  *Id.* at p. 126.  On the evening of November 29, 2006, Jones stated she had the windows in her apartment cracked open because she was a smoker.  *Id.* at p. 129.  She testified that because she has a very good view of the area surrounding her building, she had a habit of looking out at the street below to see what was going on.  *Id.* at p. 130.  Jones had lived in the apartment since 1985 and testified that she knew everyone in the neighborhood.  *Id.*  She testified that prior to Hughes's arrival at her apartment, she was looking out of her window and observed a stocky man wearing a white t-shirt and blue jeans walking up and down the street three to four times.  *Id.*  Jones said the man caught her eye because she did not know who he was.  *Id.*

Jones explained that very soon after Hughes got to her apartment they heard a scream and she ran to the window.  *Id.* at p. 131.  Jones saw the same stocky man she had seen earlier,

running from the building toward the police station.  *Id*. at pp. 132 – 33.  Jones observed that it appeared the man had something large, like a weapon, in his pants that was preventing him from running faster.  *Id*.  Jones admitted that she wears prescription contact lenses and was not wearing them at the time, preventing her from identifying the man she saw beyond the general description provided.  *Id*.

The two police officers who were the first to respond to the scene, Walter Smith and Jerome Erwin, testified for the State.  ECF 11 at Ex. 4, pp. 139 – 50; 151 – 162.  Smith's role was to render aid to the victim; he verified photographs of the crime scene during his testimony.  *Id*. at pp. 147 – 48.  Smith also testified that he secured the crime scene, which he described as widely splattered with blood and brain matter from the victim.  *Id*. at pp. 146; 149 – 50.  Under cross-examination, Smith confirmed that the victim was lying underneath an overhang located at the front door of the apartment building.  *Id*. at pp. 150 – 51.

Erwin, who was Smith's partner and the sergeant in charge of the night shift, spoke with Bryan Hughes when they arrived at the scene.  *Id*. at pp. 151 – 56.  Erwin described Hughes's demeanor as upset and said he was waving his arms at them as they pulled up to the scene.  *Id*. at p. 156.  Erwin testified that he asked Hughes who had done this to Araia and, over objection by defense counsel, related that Hughes said, "heavy-set male with a white t-shirt."  *Id*. at p. 158.  When asked where the man had gone, Erwin testified that Hughes pointed up Lee Street, a street that intersects with Maple Avenue where the apartment building is located.  *Id*.

Erwin further testified that the EMTs arrived shortly after the officers arrived; that Araia was still breathing, had a pulse, and was making subtle movements when the ambulance arrived; and that she was taken to the hospital very quickly.  ECF 11 at Ex. 4, p. 160.  In his capacity as shift commander, Erwin called for additional officers to canvass the area and called the Criminal

9

Investigations Division.  *Id*.  Erwin also explained he took Hughes to the police station to interview him and related that Hughes was visibly shaken and very upset because he knew Araia. *Id*. at pp. 161 – 62.

Michele Diagne testified that when she was dropping her child off at a daycare in Takoma Park on November 30, 2006, she noticed a hammer stuck in a fence in front of a wooded area.  ECF 11 at Ex. 4, pp. 163 – 70.  Diagne notified a school crossing guard nearby, who called the police.  *Id*.  Diagne confirmed that neither she nor the crossing guard touched the hammer and identified a hammer produced as evidence as the one she had found.  *Id*.  The school crossing-guard, Bernice Toler, also testified and confirmed seeing the "hammer inside of the fence with blood on it" found by Diagne.  ECF 11 at Ex. 5, p. 9.  Toler stated that she called the police using her cell phone and stayed in the area until the police arrived.  *Id*.

The State introduced forensic evidence through the testimony of David McGill (ECF 11 at Ex. 5, pp. 10 - 20), Damon Burman (*id*. at pp. 29 – 50), Katherine Busch (*id*. at pp. 63 – 87), and Debrah Heller (*id*. at pp. 94 – 100).  McGill, a civilian forensic specialist for the Montgomery County Police Department, processed the taxi cab identified as cab #15, which Yarborough drove home from his workplace on November 29, 2006.  ECF 11 at Ex. 5, p. 12; *see also* Ex. 6, p. 36 (testimony of Rotib Thahir).  McGill's task in processing the taxi cab was to identify any areas that may contain blood, test those areas, and collect them for DNA testing. ECF 11 at Ex. 5, p. 14.  In doing so, McGill stated that the items collected were the passenger side seat belt and belt buckle.  *Id*. at pp. 18 – 19.  McGill testified that the cab was very clean and smelled of bleach.  *Id*. at p. 20.  On cross-examination, McGill admitted that none of the tests he performed indicated the age of the stains found.  *Id*. at pp. 20 – 23; 25 – 26.

Damon Burman, a serologist with the Maryland State Police, testified about the presumptive tests for blood performed on the hammer; swabs taken from the taxi cab's steering wheel, floor mat, and passenger seat; and the seatbelt and buckle from the taxi cab. ECF 11 at Ex. 5, p. 35. Burman revealed that the tests indicated blood on the hammer and the seatbelt. *Id.* at pp. 39 – 40; 45. Burman stated that those items were packaged for later DNA testing and that the handle of the hammer was swabbed for purposes of testing for DNA. *Id.* at pp. 42 and 46. On cross-examination, Burman stated that he did not do confirmation tests on the items for the presence of blood, because the real interest was to test the items for DNA and additional tests would have required too much of the sample. *Id.* at p. 55. Additionally, Burman admitted that the test he performed detects the presence of hemoglobin and does not determine if it is human blood, nor does it reveal the age of the stain. *Id.* at pp. 53, 55 and 59.

Katherine Busch, a forensic scientist with the Maryland State Police, testified that DNA found in the stains on the hammer and the seatbelt matched the DNA taken from the known sample of Terhas Araia's blood. ECF 11 at Ex. 5, p. 81. On cross-examination, Busch admitted that the DNA test did not indicate the type of cell from which the DNA was taken. *Id.* at pp. 88 – 94.

Debrah Heller, the forensic scientist supervisor for the Maryland State Police, testified as to her role in ensuring that all protocols were followed by lab technicians during the testing process and her review of the test results. ECF 11 at Ex. 5, pp. 99 – 100. She confirmed that she concurred with Busch's conclusions and that two additional DNA analysts reviewed the file both technically and administratively. *Id.* at p. 100. Heller further stated that after the tests were performed, there was enough material left over for further DNA tests if they were requested. *Id.*

On cross-examination, Heller testified that it is possible to transfer DNA by simply touching an item, but in this case, only one DNA profile was detected. *Id*. at pp. 101 – 103.

Michael Miller, a Montgomery County firefighter trained as an emergency medical technician, testified that he drove the ambulance to the Deauville Apartment building on November 29, 2006, in response to a 911 call. ECF 11 at Ex. 5, pp. 105 – 114. Miller explained that they thought Araia had suffered a gunshot wound due to the amount of blood splatter at the scene and because one wound to her head was smaller than the one opposite to it. *Id*. at pp. 113. Miller testified that Araia had a pulse and was breathing, but her breaths were both deep and shallow, which "doctors consider Aganol [*sic*] breathing." *Id*. at p. 112. Miller was permitted to explain that "Aganol"[5] breathing was "when your body is taking its last breath or your body is still alive, but your brain is not there." *Id*. Miller explained that Araia's condition worsened en route to the hospital and that he stayed at the hospital until she was pronounced dead. *Id*. at p. 113.

Richard Poole, a detective with the Criminal Investigations Division of the Montgomery County Police, directed the initial canvass of the crime scene area and investigated the crime. ECF 11 at Ex. 5, pp. 115 – 71. Poole testified that he directed officers to talk to the residents of the apartment building to determine if there were any witnesses and that he interviewed Araia's parents. *Id*. at p. 118. Poole stated he was notified on November 30, 2006, that a hammer had been found and drove to the scene with Detective Cannatella. *Id*. at p. 119. Upon arriving, Poole stated he observed a bloody hammer hanging over a thin wire fencing covering a wooden fence. *Id*. at p. 120. Poole collected the hammer as evidence as well as some of the leaves on the ground below because it appeared blood had dripped on them. *Id*.

---

[5] Likely meant to be "agonal" breathing.

Poole's first contact with Yarborough occurred on November 30, 2006, at the Ritz Cab Company located in Northeast District of Columbia, where Yarborough worked driving taxi cabs to an inspection station for six-month inspections.   ECF 11 at Ex. 5, pp. 121 – 128.   Poole testified that Yarborough had reported to work at 8:30 that morning and had driven cab #15 to work.  *Id*. at p. 127.   During his conversation with Poole and Detective Collington, Yarborough confirmed that Terhas Araia was one of two women with whom he had a relationship.  *Id*. at p. 128.   Yarborough denied being in Takoma Park on November 29th and told Poole and Collington that he was drinking that day and remembered watching "Friends" on television that evening.  *Id*. at p. 130.   Poole testified that Yarborough identified the episode of the show he watched and stated he was one-hundred percent sure he was home watching that show.  *Id*. at pp. 130 – 31.  Poole further testified that Yarborough indicated that he may have called or texted Araia at 10:00 or 10:30 p.m. because that is the time she gets off from work.  *Id*. at p. 131. Yarborough allowed Poole to look through his cell phone during the interview and Poole testified that there were only two text messages on the phone, one of which was sent that morning to Araia telling her to "get up."  *Id*. at p. 132.   Yarborough explained to Poole that he deletes text messages because the box gets full.  *Id*.

Poole was permitted to testify over objection that when Yarborough was asked if he used drugs on November 29, 2006, he stated that he uses PCP and "smokes dippers" and that he had done so on that day.  ECF 11 at pp. 141 – 44.   When Poole advised Yarborough that he was identified in a photographic line-up and that his car was seen in the area, he testified that Yarborough replied that he did not know what Poole was talking about.  *Id*. at p. 144.   Poole stated that Yarborough said he had told Araia not to call him anymore, but that he had continued to call her.  *Id*. at p. 143.   When Poole asked if Yarborough had left a threatening voicemail

message for Araia, he told Poole, "I'm not going to beat her up or nothing." *Id*. at p. 144.   Poole

was also allowed to testify over objection that Yarborough told them that on Thanksgiving Day

he squirted beer in Araia's face during an argument.   *Id*. at p. 145.   Poole stated that Yarborough

told them he threw beer on Araia because she was not trying to keep their relationship together.

*Id*. at pp. 147 – 48.   Poole further testified that he told Yarborough they knew he had lost control,

but they knew he was a good person, and in response Yarborough asked, "Are you telling me she

is dead?" *Id*. at pp. 153 – 54.

Poole further testified that he checked on Yarborough's alibi by checking the TV Guide

for the week of November 27 through December 3, 2006, and that "Friends" was not broadcast

on November 29, 2006.   *Id*. at p. 156.   The issue of TV Guide was introduced into evidence.   *Id*.

Poole also testified regarding the execution of the search warrant for Yarborough's house

and stated that a bottle of Clorox bleach was found in his bathroom and that the house appeared

to be under construction.   *Id*. at p. 158.   Under cross-examination, Poole testified that during the

November 30 interview he accused Yarborough of doing something wrong, and despite the

accusation, Yarborough remained cooperative with questions asked and never got angry.   *Id*. at

pp. 173 – 78.

Prior to the direct testimony of Detective Tyron Collington, defense counsel moved to

exclude any mention of Yarborough's statements during his second interview with police that he

used PCP every day since May of 2006 and when he does, he blacks out and cannot remember

what he does.   ECF 11 at Ex. 5, p. 182.   The trial court withheld a ruling and instructed counsel

to raise an objection at the appropriate time during Collington's testimony.   *Id*.

Detective Collington testified that Yarborough became the focus of the investigation into Araia's murder after Collington talked to a friend of Araia's, Judy Tulday.[6]  ECF 11 at Ex. 5, p. 186.  Collington went with Tulday to the District of Columbia where he observed taxi cab #15 parked outside of Yarborough's house.  *Id*. at p. 187.  Collington then testified regarding the post-arrest interview of Yarborough at the Takoma Park Police Station.  *Id*. at p. 193.

Collington stated that the interview of Yarborough started with questions regarding his relationship with Araia which Yarborough described as "on and off."  *Id*. at p. 195.  Yarborough explained that he met Araia in 2004 through mutual friends, the relationship became intimate in May of 2005, and that he bought her a cell phone so he could talk to her.  *Id*.  Collington stated that Yarborough claimed Araia's father would not allow her to talk on the landline at the apartment.  *Id*. at p. 196.  Collington further testified that Yarborough stated that he and Araia would frequently fight, but would later end up talking again.  He further told Collington that the Saturday after the Thanksgiving when they fought, Araia would not return any of his calls.  He admitted driving to her workplace, but claimed he could not remember what car he drove there.  *Id*. at pp. 198 – 99.  Collington was permitted to testify over objection as to Yarborough's statements about his frequent use of PCP.  *Id*. at p. 201.

Dr. Carol Allan, the assistant medical examiner for Montgomery County, testified regarding the extent of Araia's injuries and the cause of her death.  ECF 11 at Ex. 6, pp. 4 – 27.  Allan testified that the initial information they were provided was that Araia was the victim of a gunshot wound, but upon examination it was clear the injuries were not consistent with a gunshot wound; rather, they were consistent with blunt force trauma.  *Id*. at pp. 15 – 16.  She further testified that the damage to Araia's skull and brain was so extensive that any one of the wounds

---

[6]  The substance of Collington's conversation with Tulday was not disclosed at trial and Tulday was not called as a witness.

she sustained would have led to her death. *Id.* at pp. 17 – 25. Allan also stated that it was impossible to tell how many wounds Araia had sustained due to the extensive damage done. *Id.* at p. 25. Under cross-examination Allan confirmed that Araia's wounds were of different sizes and shapes and were consistent with being bludgeoned by a claw-hammer. *Id.* at pp. 27 – 30.

Rotib Thahir, owner of Ritz Cab Company where Yarborough worked, testified regarding Yarborough's access to taxi cab #15. ECF 11 at Ex. 6, pp. 31 – 41. Thahir explained that Yarborough had worked for him for approximately two months prior to November 29, 2006. *Id.* at pp. 32 – 33. Thahir explained that under District of Columbia law, taxi cabs have to be inspected every six months and Yarborough's job was to drive taxi cabs that were due for inspection to the inspection station, wait for the inspection results, and return with the car. *Id.* at p. 34. If the particular taxi cab failed inspection, Yarborough would bring it back to the worksite where the needed repairs would be performed, and a repeat inspection would be done after the repairs. *Id.* at p. 35. Thahir stated that on November 29, 2006, Yarborough took taxi-cab #15 in for inspection at approximately 2:30 p.m. and the car failed inspection. *Id.* He further testified that Yarborough asked to take the cab home that evening and explained that Yarborough was often permitted to take cabs home, but was told he could not take the cab home due to the failed inspection. *Id.* at p. 36. Despite declining Yarborough's request to drive taxi-cab #15 home, Thahir testified that between 6:00 and 6:30 p.m. he noticed the cab was not on the premises and that the following morning, Yarborough drove it to work. *Id.* at p. 37. Thahir testified that the only time that particular vehicle was in Yarborough's possession was November 29, 2006. *Id.* at p. 38.

Ronald Charles Williams, a friend of Yarborough, testified for the State. ECF 11 at Ex. 6, pp. 48 – 62. Williams, who introduced Yarborough to Araia, testified he saw Yarborough

on November 30, 2006, and asked him what had happened to the cab because Yarborough was walking. *Id*. at pp. 53 – 54.  During the course of the conversation that ensued, Williams stated that Yarborough told him he had "messed up real bad" regarding Araia; that he had cleaned the taxi-cab with bleach; and that he had burned his clothes. *Id*. at pp. 55 – 56.  Williams further testified that Yarborough told him Araia had been killed with a hammer; admitted he had thrown the hammer out of the window; and wondered aloud if the police could find fingerprints on it. *Id*. at p. 58.

Williams also testified that he spoke with Yarborough on December 1, 2006, and related that Yarborough had brought beer with him to the bar where they were talking and had told Williams Yarborough could not go home because the police were at his house waiting for him. *Id*. at p. 60.  Williams stated that he refused to allow Yarborough to come to his house and told him, "You really screwed up." *Id*. at p. 61.  Prior to leaving the bar to return home and turn himself in to the police, Yarborough gave Williams his watch and said, "I'm not going to need it where I'm going." *Id*. at p. 62.

Under cross-examination, Williams admitted that he had an intimate relationship with Araia that had cooled off when Araia began seeing Yarborough. *Id*. at p. 66.  In addition, Williams admitted that Yarborough never said he killed Araia. *Id*. at p. 65.  On redirect, Williams explained that his relationship with Araia was never exclusive and that she had always been free to see whomever she liked. *Id*. at p. 67.

Prior to Isaac Araia, the victim's father, taking the stand, defense counsel made a motion in limine to exclude his testimony in its entirety because he was not a witness to anything that occurred and any testimony regarding the victim's children or her family would simply be a play on the jury's sympathies.  ECF 11 at Ex. 6, pp. 72 – 75.  The trial court admonished the State's

Attorney that Mr. Araia's testimony would have to be limited to information that would aid the jury's role of finding facts, but otherwise denied the defense's motion.  *Id*. at p. 74.

Isaac Araia testified that his daughter, Terhas Araia, worked at Whole Foods in Washington D.C. and that she got to and from work via public transportation.  ECF 11 at Ex. 6, pp. 84 – 90.  Specifically, Mr. Araia testified that a bus brought his daughter to the Takoma Park station located in front of their apartment building.  *Id*. at p. 87.  He further testified that his daughter worked from 2 p.m. to 10:30 p.m. on the weekends and generally arrived home between 11:20 p.m. and 11:30 p.m.  *Id*.  Through Mr. Araia, the State introduced a recent picture of Araia.  *Id*. at p. 90.  Following his testimony, the State rested its case, noting during a bench conference that they had decided not to call as a witness Detective Cynthia Conrad.  *Id*. at p. 91 – 92.

In light of the State's decision not to call Detective Conrad as a witness, defense counsel called her as a witness in its case-in-chief for the stated purpose of establishing the date Williams initially spoke with police and introducing evidence that Anglin identified someone else as the perpetrator during the photo array.  ECF 11 at Ex. 6, pp. 92 – 141.  After Conrad testified that Williams spoke with police on December 22, 2006 (*id*. at p. 99), she stated that Anglin had identified photos #2 and #3 as resembling the man he saw assaulting Araia.  *Id*. at p. 101.  The State then objected to allowing defense counsel to ask Conrad about the follow-up question asked of Anglin after his initial identification of two photographs, because Anglin was not cross-examined on that issue when he was on the stand.  *Id*. at pp. 101 – 108.  After lengthy argument at bench (*id*. at pp. 108 – 38), Conrad was permitted to testify that when Anglin was asked to pick between the two photographs he selected photo #2, which is not the picture of Yarborough.  *Id*. at p. 140.

During cross-examination of Conrad, the State established that Anglin was reluctant to talk to police, and that the person depicted in photo #2, Irvin Sylvester Doy, was six feet, three inches tall, weighed 235 pounds, and was never a focus in the investigation. *Id.* at pp. 141 – 43. The following day of trial, the defense rested its case and the State called Detective Poole as a rebuttal witness. ECF 11 at Ex. 7, pp. 5 – 8. Poole testified that he processed Yarborough at the police station following his arrest and indicated that Yarborough is five feet, six inches tall, and weighs 220 pounds. *Id.* at p. 7. Poole further testified that Doy was not a part of the investigation because it was determined that on November 29, 2006, he was in federal prison serving a term of fifteen years imposed on June 26, 2003. *Id.* at p. 8.

On February 8, 2008, petitioner Johann Yarborough was convicted for the November 29, 2006 first degree murder of Terhas Araia. ECF 11 at Ex. 7, p. 87. On March 21, 2008, Yarborough was sentenced to life without parole.[7] ECF 1 at p. 1.

<u>State Appellate and Post-Conviction Review</u>

On direct appeal, Yarborough alleged that the trial court erred by denying a motion to suppress his statements to police officers; allowing a detective to testify about comments made by the detectives during Yarborough's interrogation; allowing an issue of T.V. Guide into evidence to refute Yarborough's alibi that he was home watching TV on the night of the murder; and admitting evidence of Yarborough's habitual use of drugs. ECF 1 at p. 2; ECF 11 at Ex. 8, p. 2.

The claim regarding the motion to suppress reiterated argument made by trial counsel that the initial interview on November 30, 2006, was a custodial interrogation because a reasonable person in Yarborough's position would not have felt free to leave. ECF 11 at Ex. 8, pp. 10 – 14. Assuming the November 30, 2006, interview was a custodial interrogation, counsel

---

[7] The sentencing portion of the transcript is not included in the record before this court.

argued that Yarborough's request for counsel at the end of the interview prohibited an initiation of questioning by police on the date of his transfer from the District of Columbia to the Takoma Park police station, making the second statement inadmissible despite the *Miranda* warning provided before the second interrogation.  *Id*.  This claim also included an allegation that it was error for the trial court to permit Detective Poole to testify that he made statements to Yarborough indicating they knew what happened and they thought Yarborough had simply lost control.  *Id*. at pp. 15 – 18 (citing *Crawford v. State*, 285 Md. 431 (1979) (holding that investigating officers' opinions on the truthfulness of an accused's statements are inadmissible)).

The claim regarding the TV Guide asserted that admission of the magazine as evidence was improper because it was not relevant to what was actually broadcast on November 29, 2006, but only showed what was scheduled for broadcast.  ECF 11 at Ex. 8, pp. 18 – 21.  Further, appellate counsel asserted that the magazine was inadmissible because it contained extraneous hearsay evidence.  *Id*.

Appellate counsel also asserted that statements admitted through the testimony of Collington regarding Yarborough's drug use were not relevant because he did not assert any sort of intoxication defense.  ECF 11 at Ex. 8, pp. 21 – 23.  Rather, Yarborough's defense was that he did not commit the murder.  *Id*.  Counsel further argued that, to the extent the drug use evidence was relevant, the prejudicial value of the statements outweighed its probative value as it amounted to evidence of prior bad acts.  *Id*.

The Court of Special Appeals of Maryland affirmed Yarborough's conviction in an unreported opinion issued on December 22, 2009.  ECF 11 at Ex. 10.   In rejecting his claim that the trial court improperly denied the motion to suppress, the appellate court observed that the circumstances surrounding the initial interview of Yarborough on November 30 bore none of the

indicia of a custodial interrogation and did not prompt a need for a *Miranda* warning. *Id*. at pp. 5 – 9. Since the initial interview was not a custodial arrest, police were not prohibited from initiating questioning after Yarborough's arrest. *Id*. at p. 8. The court further found that admission of statements made to Yarborough indicating the police knew he had simply lost control were comments made to elicit inculpatory statements from Yarborough by expressing sympathy for his position. *Id*. at p. 17. The court differentiated *Crawford* from Yarborough's case, noting that the detectives here did not attempt to elicit statements through reliance on made-up evidence since in this case police actually did have a witness who identified Yarborough and had described his car. *Id*. Further, the appellate court noted that even if admission of these statements was error, it was harmless error given the overwhelming evidence of guilt. *Id*. at p. 18.

The appellate court rejected the claim asserting error in admission of the TV Guide and found that the publication was admissible as an exception to the hearsay rule. ECF 11 at Ex. 10, pp. 18 – 21 (citing Maryland Rule 5-803(b)(17) (publications exception)).

The appellate court also found that the trial court committed no error in permitting admission of the statements regarding Yarborough's frequent drug use. ECF 11 at Ex. 10, pp. 21 – 25. The court noted that Yarborough denied committing the murder and claimed he was at home watching television at the time of the murder. *Id*. at p. 24. When Yarborough later claimed he used PCP on a daily basis and blacked out following his use of the drug, the statements were relevant to the credibility of his claimed alibi. *Id*. at p. 25 (noting the inconsistency between remembering the episode of "Friends" he watched and the later implication that he could not recall what he did because he had used PCP on the date of the murder).

Yarborough filed a self-represented petition for writ of certiorari with the Maryland Court of Appeals, which denied it on April 12, 2010.  ECF 11 at Ex. 11, pp. 1 – 4.  Yarborough raised claims identical to those raised on appeal to the Court of Special Appeals.  *Id*.  The petition was denied without opinion by the Court of Appeals.  *Id*. at p. 5.  He did not seek further review from the United States Supreme Court.

Yarborough filed a petition for post-conviction relief in the Montgomery County Circuit Court on July 1, 2010, but withdrew it on February 11, 2011.  ECF 11 at Ex. 1.  On June 6, 2011, Yarborough filed another petition for post-conviction relief.  *Id*. at Ex. 12 and 13.  A hearing on the claims raised was held on June 6, 2013.  ECF 18-1.  Yarborough raised claims that both trial counsel and appellate counsel were ineffective.   With regard to trial counsel, Yarborough claimed that counsel was ineffective by failing to pursue a defense of not criminally responsible (NCR) based on voluntary intoxication; failing to raise Yarborough's request to discharge counsel; failing to properly cross-examine and impeach Travis Anglin; failing to investigate the crime scene; failing to object to the lack of African Americans in the jury pool; failing to object to misstatements of fact during closing arguments; failing to object to improper vouching of credibility during closing argument; failing to file a timely motion for modification of sentence; failing to "maintain his innocence"; abandoning Yarborough's only defense; failing to subpoena witnesses for the suppression hearing; failing to pursue a voluntary intoxication defense based on Yarborough's use of PCP.   Yarborough also cited the cumulative effect of these alleged errors. ECF 11 at Ex. 13; ECF 1 at pp. 4 – 5.  With regard to appellate counsel, Yarborough claimed that counsel was ineffective when counsel failed to raise on appeal the trial court's denial of the motion for new trial and failed to raise the claim regarding the trial court's failure to hold a hearing on Yarborough's request to discharge trial counsel.  *Id*.

Through his direct testimony at the post-conviction hearing, Yarborough's claims were somewhat clarified.  With respect to the defense of voluntary intoxication, Yarborough claimed that he "didn't remember the date of the murder."  ECF 18-1 at p. 16.  He further testified:

> [W]hen Mr. Shefferman came to see me, I didn't think I participated in this murder at all.  And to this day, I still don't remember this day.  So as I was thinking, I wrote him and I told him the truth.  I said I was getting high, and I blacked out.  I don't remember this day at all.  You know, maybe could somebody have set me up?  So when he came to see me the second time, we talked about it, and I asked him is there any way I could have got, I can get 20 or 30 years if it comes down to it.  And he said no way.  So the more I wrote him, he never answered me.  So I just started thinking, you know, maybe I was set up or anything, I mean, because I don't remember this evening.

*Id*.  Yarborough stated that he was frequently using PCP at the time of the murder.  *Id*.  He further testified that counsel never discussed with him the defense to be pursued at trial and that he did not know what the defense was until he read the transcript and gleaned it was based on misidentification.  *Id*. at pp. 17 – 18.

With regard to his request to discharge counsel, Yarborough testified he "wasn't getting attention" from counsel because he "wasn't answering my letters" and was not coming to see him.  *Id*. at p. 18.  He explained that he wrote to the Attorney Grievance Commission, the head of the Public Defender's Office, the prosecutor, the judge, and to trial counsel, Brian Shefferman, stating that he wanted to retain another lawyer and fire Shefferman.  *Id*. at pp. 18 – 19.  Yarborough admitted that Shefferman came to speak with him after he sent the letters requesting his removal from the case and that he did not know what Shefferman said during their five-minute meeting because he was "just shaking [his] head kind of brushing him off."  *Id*. at p. 19.  Yarborough further stated that he did not know why Shefferman wanted to meet with him since Yarborough was trying to fire him and did not want him as his lawyer.  *Id*.

Yarborough recalled that, at a hearing six months before trial, the trial judge asked about the letter he had written stating he wanted to fire counsel, but Yarborough did not address the court.  *Id*. at p. 21.  He explained that he did not say anything because by that time his family was unable to hire a private attorney and he did not think he could get another attorney assigned to the case.  *Id*. at pp. 21 and 22.

Yarborough explained that he felt counsel was ineffective when he failed to cross-examine Travis Anglin about his prior criminal history, which he described as "probation violations"; the reasons Anglin remained hidden in the bushes at the time of the crime and did not help the victim; and Anglin's failure to identify Yarborough in the photo array.  ECF 18-1 at pp. 22 – 23.  He further testified that counsel should have investigated the crime scene because he knows the area and is aware of how dark it is at 11:30 at night.  *Id*. at p. 24.  Yarborough maintained this could have been used to establish that the eyewitnesses could not have seen what they claimed to have seen.  *Id*.

With respect to his claim regarding the make-up of the jury, Yarborough testified that it was his understanding that the jury had to reflect the community from which it was drawn and that Takoma Park is "37 percent black people."  *Id*. at pp. 24 – 25.  He explained that "we never questioned or interviewed any black people to be into the jury" and there were no African-American jurors chosen.  *Id*. at p. 25.  Yarborough admitted, however, that there were "black people in the pool, but which we never interviewed or have peremptory conversation with."  *Id*.

As for Yarborough's claim that the State's Attorney made misstatements in closing argument, Yarborough referred to the prosecutor's statements that Travis Anglin identified Yarborough as the assailant and that two people testified that Yarborough killed Araia.  ECF 18-1 at p. 29.  He also testified that the State's Attorney "repeatedly vouched for [Travis Anglin's]

credibility" by "saying you know what he's saying is true." *Id*. at pp. 29 – 30.   Yarborough claimed that trial counsel's failure to object to those statements constituted ineffective assistance of counsel.

Yarborough claimed that the defense strategy chosen by counsel was ineffective and that voluntary intoxication was the only real defense.  ECF 18-1 at pp. 33 and 35.  He explained that any attempt to convince the jury there was a misidentification was not going to work because Michael Hodge, who was also at the crime scene, does not resemble him in appearance.  *Id*. at p. 33.

Yarborough's claim regarding counsel's failure to call witnesses at the suppression hearing centered on counsel's failure to subpoena Yarborough's boss and "the guy in the head office" as well as the video surveillance from the cameras.  ECF 18-1 at p. 34.  Yarborough did not proffer what those witnesses or the video would have established other than stating that it would have proved the initial interview was an interrogation.  *Id*.

The post-conviction court denied relief in a written decision issued on March 11, 2014.  ECF 11 at Ex. 13.  In an application for leave to appeal the post-conviction court's decision, Yarborough raised five claims:  trial counsel did not raise Yarborough's request to discharge counsel; trial counsel failed to investigate the crime scene; trial counsel did not file a timely motion for modification of sentence; trial counsel did not subpoena witnesses for the suppression hearing; and trial counsel did not pursue a defense of voluntary intoxication.  ECF 11 at Ex. 14.  The application was summarily denied by the Court of Special Appeals in an unreported decision issued on January 14, 2015.  ECF 11 at Ex. 15.

**Allegations in this Court**

In the instant petition for writ of habeas corpus, Yarborough claims that trial counsel rendered ineffective assistance of counsel; the trial court violated the requirements of Maryland Rule 4-215; trial counsel did not object to the jury venire panel from which African Americans were unconstitutionally excluded; and the trial court erred in denying a motion to suppress Yarborough's statement to the police.  ECF 1 at pp. 9 – 11.

Respondents assert that Yarborough's claim that trial counsel rendered ineffective assistance of counsel, as stated in the petition, raises no specific errors[8] and therefore does not sufficiently state a claim for federal habeas relief.  ECF 11 at pp. 19 – 20 (citing Rule 2, *Rules Governing Petitions for Habeas Corpus*).  They further contend that Yarborough's claim the trial court violated Maryland Rule 4-215 when it failed to convene a hearing on his request to discharge counsel raises only an allegation of violation of a State evidentiary rule that does not implicate a basis for federal relief, and the post-conviction court properly found this claim was waived.  *Id*. at pp. 20 – 21.

With regard to Yarborough's claim that trial counsel's performance was deficient when he failed to challenge the venire panel of the jury, Respondents assert this claim is procedurally defaulted because it was not raised by Yarborough in his application for leave to appeal the denial of post-conviction relief.  *Id*. at pp. 21.  Alternatively, Respondents state that even if counsel's performance could be viewed as deficient, there is no reasonable probability that the outcome of the trial would have differed and Yarborough failed to adduce evidence to establish that African Americans were excluded from the venire.  *Id*. at pp. 21 – 24.

---

[8] Yarborough filed a supplement to his petition clarifying the ineffective assistance of counsel claims. ECF 12.

Respondents also state that Yarborough's claim regarding the trial court's denial of the motion to suppress does not specify which statements made to the police he contends should have been suppressed, and therefore fails under Rule 2 of the *Rules Governing Habeas Corpus*. ECF 11 at p. 25.  To the extent that Yarborough's claim can be construed to mimic that raised on direct appeal, respondents assert that Yarborough has made no effort to dispute the "critical findings of the state court, much less prove them erroneous by clear and convincing evidence." *Id*. at p. 32.  Further, respondents assert that the appellate court's analysis of this claim was not contrary to, or an unreasonable application of, clearly established federal law.  *Id*. at p. 33.

## Standard of Review

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005).  The standard is "difficult to meet" and requires courts to give state-court decisions the benefit of the doubt.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v. Woodall,* __ U.S.__, __, 134 S. Ct 1697, 1702 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.")).

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or

2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, "an unreasonable application of federal law is different from an incorrect application of federal law."  *Id*. at 785 (internal quotation marks omitted).

Further, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Wood v. Allen*, 558 U.S. 290, 301 (2010).  "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts.  *Id*.  "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly*."  Renico v. Lett,* 559 U.S. 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379.

**Analysis**

Ineffective Assistance of Counsel Claims

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires the Court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id*. at 696.

As the Supreme Court held in *Strickland*, "a state court conclusion that counsel rendered effective assistance of counsel is not a finding of fact binding on the federal court to the extent stated by [former] 28 U.S.C. § 2254(d) [now § 2254(e)(1)]." *Id*. at 698. Rather, "although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254[(e)(1)], . . . both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* It follows, then, that § 2254(e)(1) applies to the state court's conclusion that the petitioner's trial counsel rendered

effective assistance of counsel and this Court may not grant relief on this claim as long as the state court denied the claim based on a reasonable application of the *Strickland* standard to the facts presented in the state court proceeding.

As clarified by Yarborough, his claim that counsel was ineffective is that counsel failed to properly cross-examine Travis Anglin; investigate the crime scene; object to the misstatements of facts during closing arguments and the improper vouching for witnesses' credibility; file for modification of sentence; maintain Yarborough's innocence; present other defenses; and subpoena witnesses for the suppression hearing.  ECF 12 at p. 4.  Yarborough also claims that the cumulative effect of the errors alleged rendered counsel ineffective.  *Id*.  Additionally, Yarborough appears to couch his claim regarding the jury venire as a claim that counsel was ineffective for failing to object to the exclusion of African American jurors.  *Id*. at pp. 1 – 3. Each aspect of the claim is addressed below.

The allegation that counsel did not properly cross-examine Anglin is based on trial counsel's failure to establish that Anglin was asked to narrow his choice of two photographs he identified as resembling Araia's assailant and, when he did so, he chose a photograph of someone other than Yarborough.  Notwithstanding that failure, counsel was ultimately allowed to elicit testimony from Detective Conrad establishing that Anglin chose the other photograph.

The post-conviction court correctly observed that cross-examination is ordinarily viewed as a trial tactic.  ECF 11 at Ex. 13, p. 7.  To the extent counsel failed to cross-examine Anglin about other matters pertaining to his criminal history, the post-conviction court observed that it was not known what criminal history Yarborough would have had his counsel use as a basis for those questions, or if any of the testimony would have been admissible.  *Id*.; *see also* ECF 11, Ex. 12, pp. 16 – 17 (post-conviction petition alleging, without explanation, that "other crimes"

evidence would have revealed "exculpatory evidence").   Yarborough offered no specific examples of the alleged criminal history for Anglin during his testimony at the post-conviction hearing other than "probation violations."   ECF 18-1 at pp. 22 – 23.   Without specifying the nature of the evidence counsel failed to adduce during cross-examination, the claim that counsel was ineffective for failing to do so is, at best, vague.   The post-conviction court concluded that counsel's performance was not deficient and observed that Yarborough was convicted because of the State's evidence against him and not because counsel failed to ask questions of Anglin during cross-examination.   ECF 11 at Ex. 13, p. 7.

Yarborough claims that counsel should have visited the crime scene to determine if the witnesses testifying for the State could have seen what they claimed they saw at 11:30 p.m. and to document, through photographs, the obstructions to each witness's view of the area where Araia was killed.   Yarborough raised this claim in his post-conviction proceeding, and the court characterized the claim as a "bald allegation without any support."   ECF 11 at Ex. 13, p. 7. Indeed, Yarborough's testimony at the post-conviction hearing did not illuminate the basis for the claim. ECF 18-1 at p. 24.   This is particularly so in light of the actual testimony provided by the eyewitnesses, each of whom described Yarborough's overall appearance based on their observation of him earlier in the evening.   Post-conviction relief was rightly denied on the claim because Yarborough did not sustain his burden of establishing that counsel's performance was deficient or that he was prejudiced by the failure alleged.   ECF 11 at Ex. 13, p. 7.

Yarborough also claims counsel was ineffective when they[9] failed to object to misstatements of fact by the State's Attorney during closing argument and improperly vouched for the credibility of witnesses.   In his supplement, Yarborough states that the misstatement of fact concerns a statement that five people identified him as the killer and that the victim's blood

---

[9]   Yarborough had two trial attorneys assigned to represent him.

was found on the seat belt in the taxi-cab Yarborough drove "among other things that were false." ECF 12 at p. 5.  The post-conviction court rejected this claim on the basis that the trial court instructed the jury that argument by counsel is not evidence; thus, even if facts had been misstated, counsel's failure to object did not constitute deficient performance under *Strickland*. ECF 11 at Ex. 13, p. 10.  The decision whether to object during opposing counsel's closing argument is largely one of trial strategy.  Here, Yarborough's characterization of the State's Attorney's summary of the evidence as a "misstatement of fact" is, at most, a stretch.  The State did in fact produce five witnesses that either described Yarborough's appearance or directly identified him as the person who murdered Araia.  Additionally, there was evidence produced at trial showing that blood found on the seatbelt in Yarborough's cab matched Araia's DNA.  It is not deficient performance to fail to make an objection that would likely be overruled.

Yarborough's argument regarding vouching for witness credibility concerns the State's Attorney's statement to the jury that they could believe Anglin.  ECF 12 at p. 5.  The post-conviction court rejected this claim, noting that what Yarborough alleged does not constitute improper vouching.  ECF 11 at Ex. 13, p. 10 (citing *Warren v. State*, 205 Md. App. 93, 133 – 36 (2012) (improper vouching involves expression of personal belief or assurance as to the credibility of a witness without regard to facts in evidence)).  The court further noted that the failure to object, without more, is insufficient to establish ineffective assistance of counsel.  *Id*. The statement made by the State's Attorney at Yarborough's trial referred to Anglin's reluctance to become involved as a witness and did not refer to facts were not in evidence.  *See, e.g.*, *Sivells v. State*, 196 Md. App. 254, 275 – 76 (2010) (prosecutor improperly vouched for police officers when he remarked that they would lose their pensions and their jobs if they lied as no evidence was produced at trial regarding that possibility).

Yarborough's claim that counsel failed to file a motion for modification of sentence was rejected by the post-conviction court on the basis that Yarborough failed to establish that he had directed counsel to do so, a prerequisite to the claim under Maryland Rule 4-214(b).   ECF 11 at Ex. 13, pp. 10 – 11.   Even assuming, as Yarborough alleges, that he directed counsel to file a motion, this claim involves a matter of State law that does not implicate a federal constitutional right.   Violation of a state law that does not infringe upon a specific constitutional right is cognizable in federal habeas corpus proceedings only if it amounts to a "fundamental defect which inherently results in a complete miscarriage of justice."  *Hailey v. Dorsey*, 580 F.2d 112, 115 (4th Cir. 1978) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).   The failure to file a motion for modification of sentence is not such a fundamental defect.

Yarborough's claims that counsel failed to maintain his innocence and abandoned other defenses are interrelated.   He suggests that the defense strategy of misidentification was not effectively pursued by counsel, seemingly because Yarborough's roommate was not called to the stand to augment his alibi defense and no jury instruction was requested regarding alibi.   ECF 12 at p. 5.   Yarborough then asserts, "Trial counsel put [Yarborough] at [the] scene of [the] crime with no forensic evidence of [his] being at [the] scene."  *Id*.   Yarborough then suggests that trial counsel's performance was also deficient because he abandoned available defenses of voluntary intoxication and NCR due to prolonged, habitual use of PCP.  *Id*.

Yarborough's characterization of trial counsel's performance regarding Yarborough's presence at the scene of the murder requires disregard of the State's trial evidence.   It was not defense counsel who placed Yarborough at the scene; rather, it was the testimony of witnesses who either directly identified him, described him, or with whom Yarborough spoke and admitted to his involvement in Araia's murder.   Additionally, Yarborough's explanation during his post-

conviction testimony regarding Michael Hodge's appearance and how it differs from his, presumes that counsel's strategy was to convince the jury that Hodge was the assailant and not Yarborough.  The misidentification defense, however, did not involve accusing Hodge of the murder.  As observed by the post-conviction court, "by arguing misidentification, defense counsel did [his] best under the circumstances; Yarborough was not innocent, and the most counsel could do was try to show that the State had not proved Yarborough's guilt beyond a reasonable doubt."  ECF 11 at Ex. 13, p. 11.  Counsel's performance is not constitutionally deficient where, as here, the jury was simply not persuaded by the defense due to the strong evidence presented against Yarborough by the State.

In rejecting Yarborough's claim regarding an NCR defense, the post-conviction court cited *State v. Johnson*, 143 Md. App. 173 (2002), which in the court's view demonstrates the type of evidence that must be forthcoming if a defendant is to show trial counsel was ineffective for failing to pursue such a defense.  ECF 11 at Ex. 13, pp. 5 – 6.  In *Johnson,* not only was there evidence that the defendant habitually used PCP over a prolonged period of time, but evidence also showed he exhibited bizarre behavior as a result and was diagnosed with PCP psychosis. *Johnson*, 143 Md. App. at 187 - 88.  The defendant in *Johnson* murdered his infant son, made no effort to hide the fact he had done so, and expressed the belief that the murder was a religious obligation.  *Id*. at 178 – 79.  The appellate court found that the circuit court had correctly concluded that counsel was ineffective when he withdrew an NCR plea without consulting with Johnson and failed to investigate the probable success of such a defense.  *Id*. at 198.

In contrast, the only evidence in Yarborough's case regarding PCP use was his admission to police that he used it and his claim that he blacks out afterward; there was no evidence he believed the murder of Araia was somehow justified due to a delusional belief, nor was there any

evidence that Yarborough's behavior before or after the murder was symptomatic of mental illness as in *Johnson*. There was evidence that Yarborough waited for hours for the victim to return home and, following the murder, was in such possession of his faculties that he was able to provide Hodge with directions home and instructed him to stop the car so he could get rid of the murder weapon, vitiating any plausible claim that his PCP intoxication on the night of the crime prevented him from forming the specific intent to commit first-degree murder. Lastly, there was evidence produced at trial that Yarborough took steps to hide his crime after he murdered Araia, indicating his knowledge that the act he committed was illegal and unjustified. The failure of defense counsel to pursue a frivolous defense is not deficient performance; rather, it is the fulfillment of an ethical duty. "Neither paid nor appointed counsel may deliberately mislead the court with respect to either the facts or the law, or consume the time and the energies of the court or the opposing party by advancing frivolous arguments." *McCoy v. Court of Appeals of Wisconsin, Dist. 1*, 486 U.S. 429, 436 (1988).

For similar reasons, failing to pursue a voluntary intoxication defense in an effort to refute the necessary *mens rea* for the crime of first-degree murder was not ineffective assistance of counsel, because the evidence produced at trial refutes Yarborough's claim he did not remember the night of the murder. The testimony provided by his friend, Ronald Williams, regarding Yarborough's statements about the crime in the days following Araia's murder, established that Yarborough remembered what he did and possessed a guilty conscience. *See* ECF 11 at Ex. 6, pp. 48 – 62 (testimony of Ronald Williams).

Yarborough next claims that counsel was ineffective when he failed to subpoena witnesses for the hearing on his motion to suppress. ECF 12. He suggests that video surveillance and "fact witnesses" would have established the circumstances of the interview were

such that a reasonable person would not have felt free to leave.  ECF 1 at p. 11.  In rejecting this claim, the post-conviction court observed that the trial judge did not err in denying the motion to suppress and that there is "no evidence which counsel did not produce but should have which would have shown suppression was warranted under the law."  ECF 11 at Ex. 13, p. 12.  The only factor Yarborough claims here that does not appear to have been considered in denying the motion to suppress is his allegation that the door to the office where he was interviewed was locked.  In the testimony provided at the suppression hearing, the positions within the office of the police detectives in relation to Yarborough were described; it was admitted that Yarborough requested an attorney; and the conversation following Yarborough's request for an attorney concerning whether the detectives knew of an attorney he could contact was also explained. Yarborough does not describe the evidence defense counsel could have produced that would have factored against the trial court's denial of the motion to suppress, nor did he describe that evidence during his post-conviction testimony.

Under *Strickland*, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  The failure to make a frivolous motion or to make ethically improper arguments does not establish an unprofessional error, nor is there even a remote possibility that the result of the trial would have been different had the motion been made.  *See also Horne v. Peyton*, 356 F.2d 631 (4th Cir. 1966) (fact that counsel could have done more is insufficient for reversal without any showing of harmful consequences).  While Yarborough takes the position that trial counsel's "numerous mistakes" had the cumulative effect of rendering counsel's assistance ineffective and assigns error to the post-conviction court's observation that twenty times zero is zero, it is clear that the post-conviction court's analysis of each of Yarborough's numerous

claims was not an unreasonable application of well-established law to the facts.  Yarborough has failed to establish counsel performed deficiently such that the resulting guilty verdict was not just.  The state court's analysis of the ineffective assistance of counsel claim is without error and provides no basis for federal habeas relief.

Discharge of Counsel Claim

Yarborough claims that the trial court erred when it did not engage in the required three-step analysis under Maryland Rule 4-215 after he wrote a letter expressing dissatisfaction with trial counsel to the trial court.  ECF 1 at p. 9.  In his supplemental petition, Yarborough further alleges that his post-conviction counsel allowed trial counsel to leave the hearing without testifying and assigns error to the post-conviction court's conclusion that the claim was waived because it was not raised at trial.  ECF 12 at p. 6.  He alleges that the trial court conducted a discussion off the record regarding his request to discharge counsel and that he testified to that effect at the post-conviction hearing.  *Id*.  Yarborough's testimony at post-conviction actually supports a finding that he abandoned or waived his request to discharge counsel by simply assenting to what he believed could not be changed.

Violation of the procedural requirements of a state evidentiary rule, alone, does not constitute a cognizable basis for federal habeas corpus relief.  *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2011) (federal habeas corpus relief unavailable for errors of state law); *see also* 28 U.S.C. § 2254(a).  To the extent that Yarborough's claim attempts to assert a Sixth Amendment claim in the context of his attempt to discharge counsel, the claim fails.  Yarborough's generalized claim that counsel was not tending to his case the way he should have (*see* ECF 11 at Ex. 13, p. 2) falls far short of evidence that he was forced to accept incompetent trial counsel as a result of the trial court's denial of his request.  As the post-conviction court observed, had trial counsel been

discharged, the likely result would have been that Yarborough would have represented himself at trial; instead, he was represented by two experienced trial attorneys. *Id*. at p. 6. The claim does not provide a basis for federal habeas corpus relief.

Exclusion of African Americans from Jury Claim

Yarborough claims that the jury that tried him did not represent an accurate cross-section of the community and that his trial counsel should have objected to the entire jury panel on that basis alone. ECF 1 and 12. Absent from his claim is even a hint that a discriminatory process was the cause of the racial make-up of the jury pool, which in fact did not exclude all African-American jurors. Rather, Yarborough seemingly relies on the proposition that the jury should be a mirror image of the community from which it is drawn for his claim that African American jurors were improperly excluded. *Id*. Yarborough admits that two African American jurors were either on the jury or in the jury pool; he does not state this claim clearly because he uses the terms "pool," "venire," and "jury" interchangeably. Yarborough's post-conviction testimony does not clarify the claim; rather, his testimony appears to indicate the jury that was seated after challenges for cause and peremptory challenges were made had the effect of excluding other African-Americans who could have served but were never reached in the roll-call of potential jurors.

"The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, or on the false assumption that members of his race as a group are not qualified to serve as jurors." *Powers v. Ohio*, 499 U.S. 400, 404 (1991) (internal citations omitted). "Although a defendant has no right to a 'petit jury composed in whole or in part of persons of the defendant's own race,' he or she does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria." *Id*.

(quoting *Strauder v. West Virginia,* 100 U.S. 303, 305 (1975)).  The prohibited conduct is either the exercise of peremptory challenges to exclude members of a particular race from the jury, *see Batson v. Kentucky*, 476 U.S. 79, 84 (1986), or discriminatory practices by the jury commission in selecting citizens to serve on jury duty.  *See Carter v. Jury Comm'n of Greene Cty.*, 396 U.S. 320, 330 (1970).  Yarborough does not allege such discriminatory conduct and his mistaken belief that he was entitled to a jury that mirrored the racial make-up of the community where he was tried is without merit.

Likewise, Yarborough's claim that counsel was ineffective for failing to object to the jury panel on this meritless basis is equally meritless.  Further, his argument that comments regarding Araia's nationality and Yarborough's residence in the District of Columbia somehow prejudiced him in the eyes of the jury is a bald allegation requiring a complete disregard of the insurmountable, objective evidence of his guilt.  The claim does not present a cognizable basis for federal habeas relief and the state post-conviction court's rejection of the claim was without error.  *See* ECF 11 at Ex. 13, p. 8.

Motion to Suppress Claim

Yarborough claims it was error to deny the motion to suppress the statements he made to police in the initial interview and after his arrest.  ECF 1 and 12.  Yarborough argues that the state courts denied his motion to suppress based on Detective Poole's testimony, which he characterizes as biased.  ECF 12 at p. 8.  He further suggests that the courts failed to take into account his subjective belief regarding his freedom to leave.  *Id.*

It is undisputed that Yarborough told detectives in the initial interview that he wanted an attorney.  Detective Poole further testified that questioning regarding Araia's murder ceased after Yarborough requested an attorney, but that the conversation turned to Yarborough's request for

assistance in obtaining counsel and his offer, despite his request for counsel, to take a polygraph test, which was declined. Trial counsel argued that the initial interview constituted a custodial interrogation and Yarborough's invocation of his right to counsel prohibited police from initiating questions after his arrest seven days later.

Whether a reasonable person in Yarborough's position during the first interview would have felt free to leave is a question of fact which was addressed by the trial court following presentation of evidence regarding the circumstances.  That factual determination was upheld by the Court of Special Appeals when it concluded the initial interview was not custodial and Yarborough's request for counsel did not prohibit police from initiating questioning after his arrest.

Under *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), a suspect's statements made during a custodial interrogation may not be used against him in court unless he is first advised of certain rights and then waives those rights.  The pivotal issue in the instant case was whether Yarborough was "in custody" during the initial interview with police detectives at Yarborough's place of employment.  A custodial interrogation that prompts the need to advise a suspect of his or her *Miranda* rights occurs when a suspect is "placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."  *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988).  Thus, the objective circumstances, not the suspect's subjective beliefs during the interrogation, are determinative of the issue.  *See Stansbury v. California*, 511 U.S. 318, 325 – 26 (1994).

Two questions control a court's determination of the custody issue:  "what were the circumstances surrounding the interrogation; and . . . given those circumstances, would a

reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995).   The circumstances surrounding the interrogation are a factual determination entitled to a presumption of correctness.   *Id.* (citing 28 U.S.C. § 2254).   The second inquiry is a mixed question of fact and law that requires this court's independent review.   *Id.* at 112 – 13.   That independent review, however, involves a determination that the state courts' analysis "involved an unreasonable application of clearly established federal law as determined by the Supreme Court."   *Yarborough*, 541 U.S. at 663.

Given the circumstances surrounding the initial interview of Yarborough as found by the trial court, the legal conclusion that those circumstances did not amount to a custodial interrogation did not amount to an unreasonable application of federal law.   The interview was cordial throughout and was not confrontational; took place in an environment familiar to Yarborough; did not involve a show of force from the police detectives, who were dressed in street clothes and were not brandishing firearms; was begun with assurances to Yarborough that he was free to leave and did not have to talk to the detectives; did not end in an arrest; did not involve physical restraints; and occurred at a time when Yarborough appeared sober and indicated no evidence of confusion.   *See* ECF 11 at Ex. 10, pp. 5 – 9 (Court of Special Appeals's analysis of trial court's denial of motion to suppress).   Yarborough's only suggestion that the initial interview was custodial involves his claim that the door to the office was locked, the detectives were accusing him of murder, and he was seated furthest from the door.   ECF 12 at p. 8.   Yarborough's evidence that the door was locked is his allegation that his boss had to wait to be let back into his office twice.   ECF 11 at Ex. 14, p. 8.   Evidence produced at the suppression hearing, however, established that Yarborough's employer knew the interview was going to take place before Yarborough arrived at work and cooperated with the detectives'

efforts to keep the conversation private.  Thus, the fact he waited for the door to be opened on two occasions does not establish the door was locked.  Additionally, Detective Poole did not deny making statements to Yarborough indicating that he knew what happened on the night before and telling Yarborough he understood he had lost control.  Those statements are a far cry from bellowing accusations hurled at a suspect meant to intimidate and convince him he had no choice but to speak in order to defend himself.  The stated claim does not present a basis for federal habeas relief.

### Conclusion

Having failed to establish that he is entitled to federal habeas relief, Yarborough's petition shall be dismissed.  Additionally, this court declines to issue a certificate of appealability, which may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Yarborough has made no substantial showing of the denial of a constitutional right; therefore, a certificate of appealability shall be denied.  *See* 28 U.S.C. § 2253(c)(2).

A separate order follows.


January 3, 2017                        _____/s/_____
                                       James K. Bredar
                                       United States District Judge